# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **DANA A. HOBBS,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:11CV00039 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: James P. Jones |
| **COMMISSIONER OF** | ) | United States District Judge |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

*Lewey K. Lee, Lee & Phipps, PC, Wise, Virginia, for Plaintiff. Nora Koch, Acting Regional Chief Counsel, Region III, Lori Karimoto, Assistant Regional Counsel, Robert W. Kosman, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Plaintiff Dana A. Hobbs filed this claim challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for disability insurance benefits pursuant to Title II of the Social Security Act (the "Act"), 42 U.S.C.A. § 401-433 (West 2011 & Supp. 2012). Jurisdiction of this court exists under 42 U.S.C.A. § 405(g).

Hobbs applied for disability on December 12, 2007, alleging disability beginning November 27, 2007. The claim was denied initially and upon reconsideration. A hearing was held before an administrative law judge ("ALJ") on June 8, 2010, at which Hobbs, represented by counsel, and a vocational expert testified. The ALJ issued a finding that Hobbs was not disabled on June 25, 2010. The Social Security Administration's Appeals Council denied Hobbs' request for review and the ALJ's decision became the final decision of the Commissioner. Hobbs then filed this action seeking judicial review of the ALJ's decision.

The parties have filed cross motions for summary judgment, which have been briefed. The case is ripe for decision.

II

Hobbs was 53 years old as of the date of his administrative hearing, making him a person closely approaching advanced age under the regulations. *See* 20 C.F.R. § 404.1563(d) (2012). He completed the 11th grade and obtained his GED. His prior relevant work was as an underground coal miner.

Hobbs alleged disability based on problems with his heart, lungs, kidney, liver, and anxiety. In his function reports, Hobbs stated that he lived with his wife and baby daughter. He went out two or three times weekly, but was not able to go out alone because of panic attacks. He was able to pay bills, count change, handle

a savings account, and use a checkbook/money order.  He talked on the phone a couple of times a day and reported no problems getting along with friends and neighbors.  He also stated that he got along with authority figures as long as they treated him fairly.  He stated that his condition had not affected his ability to complete tasks, use his hands, or get along with others.  He did not need or use an assistive device or wear a brace or splint.  He also stated that he had a satisfactory ability to follow spoken instructions.

*Physical Impairments.*

Hobbs presented to the emergency department at Lee Regional Medical Center in November 2007, complaining of intermittent right side chest pain that radiated into the right side of his neck.  X rays of the chest indicated mild chronic pulmonary disease and Hobbs was discharged the next day in good condition.  Hobbs returned to the emergency room six days later complaining of recurrent mid-sternal chest pressure with a burning sensation in the neck.  Pabitra Saha, M.D., performed a left heart catheterization and balloon angioplasty on Hobbs, who tolerated the procedure well.  Hobbs was discharged in stable condition, with diagnoses of small non-ST elevation myocardial infarction, coronary artery disease, and preserved left ventricular systolic function with ejection fraction of 55 percent. He was instructed on the need for complete tobacco cessation.

Hobbs followed up with Dr. Saha on December 18, 2007. Dr. Saha noted that Hobbs was doing extremely well with no symptoms of angina or shortness of breath. Hobbs had not yet returned to work because he wanted to "take it easy" at home for the next month or two and that he was considering applying for disability. (R. at 320.)

In January 2008, Hobbs saw Charles Payne, M.D., for kidney stone (nephrolithiasis) monitoring and was shown to have a large kidney stone. Dr. Payne recommended extracorporeal shock wave lithotripsy ("ESWL"), a procedure that breaks up a kidney stone. However, Dr. Payne stated that Hobbs would need to temporarily stop taking Plavix, which he had been prescribed after his angioplasty.

On January 30, 2008, Hobbs presented to the emergency department at Holston Valley Medical Center, complaining of chest pain lasting over several days. An electrocardiogram and chest pain panel were unremarkable and Hobbs felt much better after receiving a dose of Xanax.

After this incident, Hobbs followed up with his primary care physician, John Litton, M.D. He complained of chest pain. The next day, Hobbs underwent a cardiac study which revealed no evidence of myocardial ischemia or previous myocardial infarction. A stress test performed that day was normal.

Hobbs returned to Dr. Payne in February 2008. Dr. Payne noted that Hobbs was not then able to undergo ESWL treatment because he needed to be maintained on Plavix therapy for six months because of his drug-eluding cardiac stent. Dr. Payne reported that Hobbs was doing well and Hobbs did not return for another urological follow-up for 10 months.

In March 2008, Hobbs followed up with Dr. Saha. Hobbs reported that he was doing fine with on-and-off chest tightness but no symptoms of chest pain or shortness of breath. Dr. Saha concluded that Hobbs' coronary artery disease was stable. In April 2008, Hobbs returned to Dr. Saha, complaining of pain on the lateral side of the chest and on the left scapula, as well as occasional pain on the right side of his chest that reduced with Tylenol. Dr. Saha observed that the chest pain was atypical, non-cardiac and probably musculoskeletal. Hobbs also reported to Dr. Saha that he had returned to work, had no problem at work, and was active with taking care of his family and working without any difficulties.

In June and November 2008, two state agency physicians, Thomas M. Phillips, M.D., and Joseph Duckwall, M.D., reviewed Hobbs' file and opined that Hobbs' coronary artery disease would not preclude him from doing light work. Dr. Duckwall also concluded that Hobbs should not be exposed to respiratory irritants.

In January 2009, Hobbs saw Kurt Ick, M.D., an associate of Dr. Payne, complaining of pain and discomfort and requesting pain medication. An X ray was

-5-

Case 2:11-cv-00039-JPJ-PMS   Document 17   Filed 07/25/12   Page 5 of 20   Pageid#: 666

positive for kidney stones. Dr. Payne then performed two additional ESWLs on Hobbs and reported that Hobbs did well after these treatments. Hobbs was asymptomatic for kidney stones.

In February 2009, Hobbs saw Dr. Saha for a follow-up. Hobbs had no new complaints and Dr. Saha concluded that Hobbs' coronary artery disease was stable.

In August 2009, Hobbs followed-up with Dr. Payne and reported that he was not having problems with any flank pain, hematuria, or other urinary problems. He exercised without significant difficulty. X ray revealed removal/passage of multiple kidney stones. Dr. Payne concluded that his condition was stable.

In December 2009, Hobbs saw Dr. Litton complaining of blood in his urine, dysuria, and flank pain. Hobbs followed up with Dr. Payne who, after ruling out any intravesical lesions, advised that the blood in the urine was most likely secondary to kidney stones and Plavix. Dr. Payne recommended that Hobbs stop Plavix therapy whenever he saw blood in his urine.

In February 2010, Hobbs underwent an echocardiogram that showed a well-preserved ejection fraction in the range of 55 to 60 percent, no regional motion abnormality, and trace mitral and tricuspid regurgitation. Hobbs followed up with Dr. Saha in March 2010 and Dr. Saha concluded that Hobbs' coronary artery disease remained stable.

In April 2010, Dr. Litton completed an Assessment of Ability to Do Work-Related Activities (Physical) and opined that Hobbs could frequently lift five to ten pounds, and stand or walk three to four hours and sit three to four hours in an eight-hour work day. Dr. Litton opined that Hobbs would have problems handling, pushing, and pulling, and that Hobbs' impairments would cause Hobbs to be absent from work for about two days a month.

*Mental Impairment.*

In December 2006, Dr. Litton reported that Hobbs had been diagnosed with an anxiety disorder "many years ago." (R. at 327.) Dr. Litton prescribed an anti-depressant for treatment of panic disorder without agoraphobia but noted that "true panic attacks apparently do not occur." *Id.* In October 2007, Dr. Litton noted that Hobbs complained of continuing symptoms of a panic attack occurring approximately once a month, but again noted that Hobbs did not have "[t]rue" panic attacks. (R. at 335.) In December 2007, Dr. Litton noted that Hobbs denied being depressed and the depression screen was negative. In February 2008, Dr. Litton found that Hobbs exhibited appropriate effect and demeanor on psychiatric evaluation.

In June 2008, Hobbs underwent a consultative psychological evaluation by B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist. Hobbs was oriented in all spheres, hygiene and grooming were adequate, speech was clear and intelligible

and communication skills were intact. His affect was mixed. Dr. Lanthorn described Hobbs' mood as agitated depression and noted that his hands were mildly tremulous. Hobbs was pleasant and cooperative. Hobbs complained of short-term memory loss and difficulty with concentration. However, Hobbs performed serial seven subtractions and spelled "world" both forward and backward, correctly interpreted two out of three common-used adages, and recalled seven digits forward and five digits backward. In response to five questions to evaluate Hobbs' basic judgment skills, Hobbs answered all questions correctly.

Dr. Lanthorn concluded that Hobbs functioned in the low-average range intellectually and diagnosed a panic disorder without agoraphobia, a single episode major depressive disorder, an anxiety disorder with generalized anxiety due to chronic medical problems, and nicotine dependence. Dr. Lanthorn completed an Adult Intake – Social History Questionnaire with regard to Hobbs but did not otherwise perform a mental status evaluation. Dr. Lanthorn stated that he believed that Hobbs would have a difficult time with respect to sustaining concentration and work-related procedures.

In July and August 2008, Dr. Litton conducted a depression screen on Hobbs. It was positive for an anxious mood, decreased ability to concentrate, and sadness. Psychiatric evaluations indicated an appropriate affect and demeanor and

Dr. Litton recommended that Hobbs participate in an exercise and stress reduction programs and increase his social interactions.

In September 2008, Dr. Lanthorn completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental). Dr. Lanthorn concluded that Hobbs could satisfactorily understand, remember, and carry-out simple instructions and make judgment on simple work-related decisions. Further, Hobbs' condition caused an extreme limitation on his ability to carry out complex instructions and make judgments on complex work-related decisions. There was a marked limitation on Hobbs' ability to understand and remember complex instructions, interact appropriately with supervisors, co-workers, and the public, and respond to changes in a routine work setting. Finally, Dr. Lanthorn felt that Hobbs' impairment or treatment would cause him to be absent from work for more than two days a month.

At the October 2008 visit to Dr. Litton, Hobbs complained of intermittent mild depression. Hobbs was working full time and his affect and demeanor were appropriate.

In June and November 2008, Richard Milan, Ph.D., and Louis Perrott, Ph.D., psychological consultants with the state agency, reviewed Hobbs' file and opined that Hobbs retained the ability to perform unskilled work. Dr. Perrott concluded that Hobbs' affective disorder and anxiety-related disorder had caused

no restriction in Hobbs' activities of daily living, moderate difficulties in maintaining social functioning and concentration, persistence, and pace, and no episodes of decompensation of extended duration.

In December 2008, Hobbs was seen by Dr. Litton and reported that he continued to experience intermittent mild symptoms of depression. Hobbs remained working full time. After a February 2009 visit, Dr. Litton reported that Hobbs affect and demeanor remained appropriate. At his April 2009 visit, Hobbs said that he was doing well and denied any depressive symptoms and "fairly infrequent" affective symptoms. (R. at 465.) At his July 2009 visit, Hobbs' depression screen was negative.

Hobbs saw Dr. Lanthorn in June 2009. In August 2009, Dr. Lanthorn completed another Assessment of Ability to Do Work-Related Activities (Mental). Dr. Lanthorn opined that Hobbs had a poor ability perform several work-related functions, including dealing with the public and work stresses, maintaining concentration/attention, and understanding, remembering, and carrying out complex job instructions. Dr. Lanthorn opined that Hobbs had a fair ability to perform other work-related activities, including following work rules, relating to co-workers, interacting with supervisors, and understanding, remembering, and carrying out detailed (but not complex) job instructions. Dr. Lanthorn anticipated

Hobbs' condition/treatment would cause him to absent from work more than two days per month.

In December 2009, Dr. Litton observed that Hobbs' affect and demeanor were appropriate.

In March 2010, Dr. Lanthorn completed another assessment of Hobbs' work-related mental abilities after seeing Hobbs. Dr. Lanthorn noted that this session with Hobbs was the first since the June 2009 session. Dr. Lanthorn did not administer any psychodiagnostic tests but concluded that Hobbs' condition had worsened, based primarily on Hobbs' reported symptoms.

At his administrative hearing, Hobbs testified that although he had had problems with kidney stones for the past 10 years, they had never prevented him from working. However, he stated that the hematuria related to the stones had worsened because he was being treated with Plavix and that he had blood in his urine all the time because of the kidney stones. At the time of the hearing, Hobbs had not seen Dr. Payne for about six months. Hobbs testified that Xanax helped with his panic attacks.

The ALJ posed a hypothetical question to the vocational expert outlining an individual with Hobbs' background and the following limitations: occasionally lift up to 20 pounds, frequently lift up to 10 pounds, stand or walk about six hours in an eight-hour work day, sit for total of six hours in an eight-hour day, avoid

concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, perform unskilled work, and avoid working and interacting with the public or crowds of more than 20 people. The vocational expert testified that such an individual could perform a significant number of unskilled light jobs in the national economy.

In his decision, the ALJ concluded that Hobbs suffered from the severe impairments of coronary artery disease, kidney stones, depression, and anxiety-related disorder. The ALJ concluded that Hobbs did not have an impairment that met or medically equaled a listed impairment. The ALJ found that Hobbs retained the residual functional capacity ("RFC") to perform unskilled light work but should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, and should avoid interacting with the public or working in crowds of more than 20 people. Based on this, the ALJ concluded that Hobbs was unable to perform his past relevant work. Based on the testimony of the vocational expert, however, the ALJ concluded that Hobbs could perform work that exists in significant numbers in the national economy and thus was not disabled.

Hobbs argues that the ALJ's decision is not supported by substantial evidence.[1] For the following reasons, I disagree.

---

[1] Hobbs submitted additional evidence to the Appeals Council, including records from Robert Spangler, Ph.D., Dr. Litton, Lee Regional Medical Center, and Dr. Payne. Hobbs does not argue here that this evidence shows that substantial evidence does not support the ALJ's decision.

-12-

III

The plaintiff bears the burden of proving that he is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423(d)(2)(A).

In assessing disability claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or medically equals the severity of a listed impairment; (4) could return to his past relevant work; and (5) if not, whether he could perform other work present in the national economy. *See* 20 C.F.R. § 404.1520(a)(4) (2012). If it is determined at any point in the five-step analysis that the claimant is not disabled, the inquiry immediately ceases. *Id.* The fourth and fifth steps of the inquiry require an assessment of the claimant's RFC, which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *Id.*; *Johnson v. Barnhart*, 434 F.3d 650, 653-54 (4th Cir. 2005).

In accordance with the Act, I must uphold the Commissioner's findings if substantial evidence supports them and the findings were reached through application of the correct legal standard. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It is the role of the ALJ to resolve evidentiary conflicts, including inconsistencies in the evidence. *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). It is not the role of this court to substitute its judgment for that of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Hobbs first argues that the ALJ erred because he failed to set forth sufficient facts to support his conclusion that Hobbs' mental impairment did not meet or medically equal the criteria laid out in paragraph B of §§ 12.04 and 12.06 of the Listings. 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.04; 12.06 (2012). In the section of his decision stating his conclusions that Hobbs' impairments did not meet or medically equal any of the listed impairments, the ALJ stated that Hobbs' depression and anxiety-related condition had caused only moderate restrictions on Hobbs' activities of daily living, social functioning, and concentration, persistence,

-14-

Case 2:11-cv-00039-JPJ-PMS   Document 17   Filed 07/25/12   Page 14 of 20   Pageid#: 675

and pace and had not caused an episode of decompensation of extended duration. Although the ALJ did not set forth the factual support for those conclusions in that particular section of his decision, he stated that the basis for his determination was explained subsequently in his decision. In the later section of his decision where he assessed Hobbs' RFC, the ALJ set forth sufficient evidence to support his conclusion that no listing criteria for Hobbs' mental impairments were met. Essentially, the ALJ stated his conclusions on the paragraph B factors in the section devoted to step 3 of the analysis and set forth the supporting evidence and analysis for those conclusions in the section devoted to step 4.

The ALJ has a duty to provide a clear explanation of the facts relied upon in coming to his decision. However, this requirement does not impose upon the ALJ a particular order or formula for his decisions, nor does it impose "a mandate for administrative verbosity or pedantry." *Piney Mountain Coal Co. v. Mays*, 176 F.3d 753, 762 n.10 (4th Cir. 1998). The ALJ is only required to supply an explanation that allows the reviewing court to "discern what the ALJ did and why he did it." *Id.* (internal quotation marks and citation omitted). The ALJ's decision certainly allows this court to assess the basis for his conclusion that the paragraph B factors were not met.

The evidence recited supports the conclusion that Hobbs' mental impairments caused no more than moderate limitations in his activities of daily

-15-

living, social functioning, and concentration, persistence and pace. As reported and testified to by Hobbs, he lives with his family, goes out multiple times a week, gets along with his neighbors and friends and with authority figures. He had no problem maintaining his finances. Testing by Dr. Lanthorn showed that, among other tasks, Hobbs could perform serial sevens and spell "world" forward and backward. The ALJ considered the fact that Dr. Lanthorn opined that Hobbs had problems concentrating but concluded that this opinion was really based on Hobbs' reported symptoms, not clinical findings. In addition, the ALJ noted that Hobbs himself reported to Drs. Saha and Litton that he was working full time during the time he was supposedly disabled by his mental impairments. All of this evidence, recited by the ALJ, supports the ALJ's conclusion that Hobbs' had only moderate limitations in activities of daily living, social functioning, and concentration, persistence, and pace. The ALJ clearly relied upon this evidence in making his determination at step 3 and so indicated in his opinion.

Similarly, there is no evidence of any episodes of decompensation in the record. The regulations provide that episodes of decompensation may be inferred from medical records showing a significant alteration in medication or documentation of the need for a more structured psychological support system, such as hospitalization or placement in a halfway house or a highly structured and directing household. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §12.00C4 (2012).

The ALJ found that Hobbs' depression and anxiety were controlled by medication. Dr. Litton, Hobbs' primary care physician, stated that Hobbs' panic attacks were not "true" panic attacks and generally described Hobbs' depression as mild and intermittent. There was no evidence of hospitalization for mental issues or the need for a structured psychological support system. Indeed, Hobbs did not have a history of regular mental health treatment. Again, the ALJ's decision provides the basis for his decision that Hobbs' mental impairments do not meet or medically equal a listing requirement.

Hobbs next argues that substantial evidence does not support the ALJ's RFC determination because the opinions of Dr. Litton and Dr. Lanthorn indicate more severe limitations. Hobbs also argues that the ALJ erred because he did not give controlling weight to Dr. Lanthorn's opinion under the "treating physician rule."

The determination of the RFC is squarely within the discretion of the ALJ. *See* 20 C.F.R. § 404.1546 (2012). In making that determination, the ALJ assesses all of the evidence in the record, including the medical opinions. The ALJ assesses the medical opinion evidence pursuant to 20 C.F.R. § 404.1527 (2012). The regulations provide that a medical opinion is to be given greater weight when it is supported by relevant evidence and when it is consistent with the "record as a whole." 20 C.F.R. § 404.1527(d)(2-4).

Dr. Litton's opinion assessed Hobbs with greater limitations based on physical impairments than the ALJ's RFC. The ALJ concluded that Dr. Litton's opinion was only entitled to "some" weight and did not merit controlling weight because it was not supported by the clinical findings in Dr. Litton's treatment records or by the evidence as a whole. Multiple tests, conducted by Dr. Saha and Dr. Litton, showed that Hobbs' coronary artery disease was stable after November 2007. Dr. Saha concluded that Hobbs' reported chest pain was not cardiac related. Further, Dr. Duckwall, on reviewing Hobbs' file, opined that Hobbs' coronary artery disease would not preclude him from doing light work where he was not exposed to respiratory irritants.

As to Hobbs' problems with kidney stones, the evidence shows that while Hobbs certainly had problems with kidney stones in the past, there were no significant on-going urinary or urological complaints. Hobbs main complaint was hematuria which Dr. Payne concluded was a secondary symptom due to Hobbs' use of Plavix and recommended that Hobbs simply stop using Plavix when he observed hematuria. Generally, Dr. Payne indicated that his planned treatment of Hobbs' kidney problems was conservative. The evidence simply does not indicate that Hobbs' kidney stones were a work-impeding or preventing condition. Thus, the ALJ was within his discretion in concluding that Dr. Litton's more severe

limitations were not supported by the record and his opinion was entitled to only "some" weight.

The ALJ gave little weight to Dr. Lanthorn's opinions, noting that Dr. Lanthorn's assessment was primarily based upon Hobbs' reported symptoms and limitations and not on clinical evidence. Further, the ALJ found that the opinions were not supported by the record as a whole, which indicated only mild to moderate mental impairments. For example, Dr. Litton consistently concluded that Hobbs' panic attacks were not true panic attacks and Hobbs generally reported only mild and intermittent symptoms of depression. Throughout the relevant period, Hobbs affect and demeanor were appropriate. In addition, as noted above, Hobbs' mental impairments had little effect on his daily life and Hobbs received very conservative treatment throughout the relevant period. The state agency psychologist found only mild to moderate limitations on Hobbs' ability to do work. The evidence simply does not support Dr. Lanthorn's severe limitations.

Hobbs' argument that the ALJ erred by failing to give Dr. Lanthorn's opinions significant weight under the treating physician rule is also misplaced. A medical opinion from an acceptable treating source is given "controlling" weight only when it is "well-supported" by "medically acceptable clinical and laboratory diagnostic findings" and when it is "not inconsistent" with the other "substantial" evidence in the case. 20 C.F.R. § 404.1527(d)(2). As stated above, Dr. Lanthorn's

-19-

opinions do not satisfy this standard. In addition, although Dr. Lanthorn was technically a treating physician, the treatment relationship was very limited and sporadic. The ALJ was within his discretion to give them only little weight.

The ALJ did include mental limitations in the RFC that reflected the mental impairments supported by the record, i.e. the limitation to unskilled work and the limitation on interacting with the public or working with more than 20 people. The ALJ's RFC is supported by substantial evidence in the record.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted. A final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: July 25, 2012

/s/ James P. Jones
United States District Judge